UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO.: 2:21-cr-21-TPB-MRM

JACOB F. PALMER, III
_____/

## REPORT AND RECOMMENDATION

Pending before the Court is Defendant's Motion for Pre-Trial Suppression

Hearing and Memorandum of Law in Support Thereof, filed on May 3, 2021.  (Doc.

26).  Defendant, Jacob F. Palmer, III, is charged with one count of violating 18

U.S.C. §§ 1703(a), secreting, destroying, detaining, delaying, or opening any letter

entrusted to him that had come into his possession, and which was intended to be

conveyed by mail in the execution of his duties as an employee of the United States

Postal Service.  (Doc. 1 at 1-2).  Defendant seeks to suppress "[a]ll evidence[]

obtained as a result of the illegal search," including:

> (1) [a c]heck for $5,893.88 to ENO Plastic USA in Fairfield,
> CA from Abec Filtration; (2) [a c]heck for $2,150 to
> Window Genie of Naples from Anchor Associates Inc.; (3)
> [a] Victoria['s] Secret Card in the name of Holly Barlow; (4)
> [a] Cheesecake [Factory] Gift card;[1] and (5) a Christmas
> Card to 3250 Quilcene Lane, Naples, Florida.

---

[1]  At the suppression hearing, the United States advised that it has no intention of
using the Cheesecake Factory gift card as evidence in this case.  (Tr. at 36, 162).

(Doc. 26 at 6-7).  The United States filed a response in opposition on May 17, 2021.
(Doc. 31).  Defendant filed a reply on June 3, 2021.  (Doc. 38).  The Undersigned
conducted an evidentiary hearing on July 21, 2021.[2]  This matter is ripe for review.

For the reasons explained below, the Undersigned respectfully recommends
that Defendant's Motion for Pre-Trial Suppression Hearing and Memorandum of
Law in Support Thereof (Doc. 26) be **GRANTED in part and DENIED in part**.

## I.    Factual Background

In December 2020, Defendant was working as a mail carrier, assigned to the
Naples Main Post Office, located in Collier County, Florida.  (Doc. 31 at 1; *see also*
Doc. 26 at 2).  On December 7, 2020, the United States Postal Service, Office of
Inspector General ("OIG") received a complaint of a missing parcel destined for a
residence along Defendant's delivery route.  (Doc. 31 at 1-2; *see also* Tr. at 126-27).
In light of this complaint, the OIG began investigating Defendant.  (*See, e.g.*, Tr. at
63-64, 126-27, 146-47).

On December 18, 2020, Special Agent Jill Younce contacted the Collier
County Sheriff's Office and informed Deputy Daniel McCoy[3] that Defendant had a
suspended driver's license.  (Tr. at 129).

---

[2]  A transcript of the evidentiary hearing is filed at Doc. 51.  The Undersigned refers
to the transcript herein as "Tr." followed by the appropriate page number.

[3]  Although Daniel McCoy now works as a Special Agent with the FBI, the
Undersigned refers to Special Agent McCoy as Deputy Daniel McCoy to reflect the
position he held at the time of the events underlying the instant case and motion.

Because Defendant had a suspended driver's license and an expired registration, Deputy McCoy stopped Defendant.  (Doc. 26 at 1; Doc. 31 at 2; *see also* Tr. at 32).  At the time of the stop, Defendant was working as a rural mail carrier, using his personal vehicle to deliver the mail.  (Doc. 26 at 2; *see also* Doc. 31 at 1).  Deputy McCoy arrested Defendant for driving while his license was suspended.  (Doc. 31 at 2; *see also* Doc. 26 at 1-2).  In light of Defendant's arrest and the location of Defendant's stopped vehicle, Deputy McCoy determined that the vehicle must be towed.  (Tr. at 16-17).  Deputy McCoy then began an inventory search as required by the Collier County Sheriff's Office's standard procedures.  (*Id*. at 17).  Deputy McCoy called Special Agent Younce to take custody of the mail inside the vehicle.  (*Id*. at 18-20).

Special Agent Younce and Special Agent Steve Morrison arrived at the scene and, with the eventual help of Mr. Michael Felix – Defendant's supervisor – removed the undelivered mail.  (Doc. 31 at 3; *see also* Doc. 26 at 2).  While removing the mail, Special Agents Younce and Morrison discovered the items of evidence Defendant now seeks to suppress.  (Doc. 31 at 3-4; *see also* Doc. 26 at 2-3).

## II.    Summary of the Arguments

In his motion, Defendant argues that his Fourth Amendment rights were violated because the "Collier County Sheriff's Office did not undertake a routine inventory search in compliance with its procedures."  (Doc. 26 at 3).  Defendant first notes that the Government did not have a warrant to search Defendant's vehicle.  He argues, therefore, that the Government must show that an exception to the warrant

3

requirement applied.  (*Id.* at 5 (citation omitted)).  Moreover, Defendant contends that although the reports of Special Agents Younce and Morrison and Deputy McCoy state that the warrantless search was an inventory search, "[t]he Government . . . cannot prove that the alleged inventory search was a valid inventory search recognized as an exception to the Fourth Amendment."  (*Id.* at 5 (citation omitted)).  Specifically, Defendant contends that Deputy McCoy violated the Collier County Sheriff's Office's standard procedures by "includ[ing] Special Agents Younce and Morrison . . . —agents of a separate sovereign and unaffiliated with the Collier County Sheriff's Office—" in the inventory search.  (*Id.* at 5-6).

To that end, Defendant points out that Section 1.27.3(B) of the Collier County Sheriff's Office's Operations Manual states:  "[Collier County Sheriff's Office] Deputies shall make an inventory search of each impounded vehicle if they reasonably believe such search would meet the objectives of the policy set forth in Paragraph 1.27.3[(A)]."  (*Id.* at 6 (quoting Doc. 26-1 at 2)).  Defendant maintains that "[t]he Operations Manual does not provide for anyone other than a [Collier County Sheriff's Office] Deputy to conduct an inventory search," including members of the public or agents of another sovereign.  (*Id.*).  Accordingly, Defendant argues that Special Agents Younce's and Morrison's participation violated the Collier County Sheriff's Office's standard procedures and, therefore, the inventory exception to the warrant requirement does not apply.  (*Id.* at 6).

In response, the Government argues that Deputy McCoy lawfully stopped Defendant for driving with a suspended license and an expired registration.  (Doc. 31

at 6-7 (citations omitted)).  The Government contends that an inventory search was necessary under the Collier County Sheriff's Office's standard procedures because the vehicle needed to be towed given that the only individual in the vehicle was being arrested and the vehicle was blocking traffic.  (Tr. at 159-60).

The Government maintains that as Deputy McCoy began his inventory search, he became aware of the undelivered mail and determined that it needed to be returned to the post office.  (Doc. 31 at 7; *see* Tr. at 164).  Thus, Deputy McCoy contacted Special Agent Younce to have the United States Postal Service take control of the mail.  (Doc. 31 at 7; Tr. at 164-65).  Relying on Section 224.4 of the U.S. Postal Service Manual,[4] the Government maintains that because Defendant was a rural carrier, he was aware that his personal vehicle was subject to search and inspection by managers.  (Doc. 31 at 8).  Additionally, at the hearing, the Government noted that nothing in the Collier County Sheriff's Office's standard procedures prohibits the Sheriff's Office from involving another law enforcement agency to assist with the removal of property from an impounded vehicle.  (Tr. at 191).

---

[4] Section 224.4 of the U.S. Postal Service Manual requires, in relevant part, that managers to make periodic checks of a carrier's vehicle to ensure that:  (1) mail is not left in the vehicle; (2) the vehicle "is adequate to accommodate the normal mail workload;" (3) "[t]he vehicle offers adequate protection against loss or damage to the mail;" and (4) "[t]he daily mileage recorded from the vehicle odometer does not excessively exceed the authorized milage of the route."  (Doc. 38-1 at 2).

The Government contends that upon arriving at the scene, Special Agent Morrison discovered a Victoria's Secret credit card that did not belong to Defendant. (Tr. at 169-70).[5]  Additionally, the Government contends that the incriminating nature of the credit card was readily apparent to Special Agent Morrison.  (*Id.* at 170, 173).  The Government also asserts that while retrieving the mail, Special Agents Younce and Morrison observed a piece of mail that readily appeared to be a "rifled or an opened envelope" addressed to another individual on the floorboard of the vehicle.  (Doc. 31 at 8).  Testimony at the evidentiary hearing clarified that this is the greeting card addressed to 3250 Quilcene Lane, Naples, Florida.  (Tr. at 152; Doc. 47-14).  The Government relies on the plain view doctrine to argue that the discovery of the greeting card does not offend the Constitution because the agents had justification for being in the car and it was immediately apparent that the envelope was evidence of a crime.  (Doc. 31 at 7-8).

The Government contends that the inadvertent discovery of the greeting card gave rise to probable cause to believe that evidence of criminal activity could be found in Defendant's vehicle.  (*Id.* at 9).  As a result, the Government essentially argues that, under the automobile exception to the warrant requirement, the agents were permitted to "search [the] automobile and the containers within it where they

---

[5]  Although Special Agent Morrison testified that the credit card was on the seat, (Tr. at 91), Special Agent Younce testified that it was on the dashboard, (*id.* at 153). Moreover, the Government's motion states that the credit card was in Defendant's wallet, (Doc. 31 at 3-4).  The Undersigned addresses these discrepancies when analyzing the admissibility of the credit card.  *See* Part IV.c.2, *infra*

have probable cause to believe contraband or evidence is contained." (*See id.* at 9-10 (quoting *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019))). Thus, the Government contends that the evidence discovered after the greeting card is admissible under the automobile exception to the warrant requirement. (*See* Tr. at 166-69).

Finally, the Government argues that "the search was also permissible as an inventory search since the deputy was having the vehicle towed." (Doc. 31 at 10). The Government argues that under the standard procedures, Deputy McCoy would have needed to open all opened and closed containers as well as search the trunk, the glove compartment, the center console, and the interior of the vehicle. (Tr. at 165-66). Thus, the Government contends that the evidence would "inevitably" have been discovered during the routine inventory search before towing. (Doc. 31 at 10-11). Accordingly, the Government essentially argues that the evidence is admissible because there is a "reasonable probability that the evidence would have been discovered during a lawful inventory search" and the search was actively pursued. (*See id.* at 11 (citing *United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015))).

In sum, the Government essentially contends that Defendant's Fourth Amendment rights were not violated because the initial evidence of the Victoria's Secret credit card and the greeting card are admissible under the plain view doctrine, and the remaining evidence is admissible under the automobile exception. (*See id.*). Alternatively, the Government essentially argues that the evidence would be admissible under the inevitable discovery doctrine because the Collier County

Sheriff's Office would have discovered the evidence during its inventory search. (*See id.* at 11-12). As a result, the Government maintains that the evidence should not be suppressed. (*Id.* at 12).

In his reply, Defendant begins by arguing that while Defendant's manager may have had the right to inspect Defendant's vehicle pursuant to Section 224.4 of the U.S. Postal Manual, Special Agents Younce and Morrison did not have the same right. (Doc. 38 at 2-3). Thus, Defendant maintains that Section 224.4 of the U.S. Postal Manual does not justify the warrantless search. (*Id.* at 3).

Additionally, Defendant contends that the plain view doctrine does not apply because Special "Agents Morrison and Younce were engaged in an illegal search at the time that the envelope was discovered" and the incriminating nature could not have been readily apparent. (*Id.* at 3-4). Specifically, Defendant argued at the hearing that the illegal search began when Special Agent Morrison entered the front seat of the car and Special Agent Younce opened the vehicle's door, even if their intent had been to obtain the undelivered mail. (Tr. at 183-84, 186-87). For the same reasons, Defendant maintains that the plain view doctrine does not apply to the Victoria's Secret credit card. (*Id.* at 184-85). Ultimately, it is Defendant's position that the plain view doctrine cannot apply to any evidence because the OIG agents were required to have a warrant to access the vehicle to retrieve the live mail. (*Id.* at 187). Furthermore, Defendant maintains that the plain view doctrine does not apply to the evidence because the evidence needed to be "manipulated" in order to determine its incriminating nature. (*Id.* at 188).

8

Defendant further argues that the automobile exception does not apply because that exception wrongly assumes that the evidence is admissible under the plain view doctrine in the first instance. (Doc. 38 at 5). Defendant contends that "[t]he Government cannot rely upon fruits of the poisonous tree to justify probable cause for a warrantless automobile search." (*Id.* (citing *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003))). Thus, Defendant maintains that the search was conducted without probable cause. (*Id.*).

Finally, Defendant argues that the inventory exception does not apply because the Collier County Sherriff's Office deputies "did not comply with the previously established routine procedures" given that Special Agents Younce and Morrison participated in the inventory search despite not being Collier County Sherriff's Office deputies. (*Id.* at 6). Essentially, Defendant contends that because the inventory search itself was unlawful, the inevitable discovery doctrine cannot apply. (*See id.*; Tr. at 182-84).

## III.   Summary of the Evidence

The Government called four witnesses at the hearing: (1) former Deputy Daniel McCoy; (2) Special Agent Steve Morrison, USPS-OIG; (3) Supervisor Michael Felix, USPS; and (4) Special Agent Jill Younce, USPS-OIG. (Tr. at 12, 63, 107, 126). Defendant did not call any witnesses at the hearing. (*Id.* at 161-62).

The Undersigned summarizes the testimony elicited at the hearing.

a.   **Deputy Daniel McCoy**

i.  **Direct Examination**

On direct examination, Deputy McCoy testified that in December 2020, he was working as a corporal in road patrol with the Collier County Sheriff's Office, a position he held for almost six years.  (*See id*. at 12-13).

On December 18, 2020, Special Agent Jill Younce of the United States Postal Service, OIG contacted Deputy McCoy and informed him that the OIG was investigating Mr. Palmer and that Mr. Palmer had a suspended driver's license.  (*Id.* at 13).  Special Agent Younce also provided Deputy McCoy with information as to the route Mr. Palmer would be working that day.  (*Id.* at 13-14).

Deputy McCoy testified that when he saw Mr. Palmer's vehicle, Deputy McCoy ran a license plate inquiry and discovered that the registered owner of the vehicle – Mr. Palmer – had a suspended driver's license.  (*Id.*).  Deputy McCoy also noticed that the vehicle's registration was expired.  (*Id.* at 14).  Deputy McCoy stated that both an expired registration and driving on a suspended license are offenses for which he can pull a vehicle over, (*id.*), and later testified that he decided to pull the vehicle over for both offenses, (*id.* at 32).  Deputy McCoy's dashcam recorded the encounter with Mr. Palmer.  (*See id.* at 14-15).  Excerpts of the video were published during Deputy McCoy's testimony.  (*Id.* at 17, 18, 22, 27).

Deputy McCoy testified that when he activated his emergency lights to signal the vehicle to pull over, the vehicle stopped in the entranceway to a gas station.  (*Id.*

10

at 15).  Deputy McCoy then followed standard procedures by approaching the

vehicle, introducing himself, and asking for the driver's documentation, including a

driver's license, registration, and proof of insurance.  (*Id.* at 15-16).  Mr. Palmer

could not produce a driver's license but provided an identification card, which

Deputy McCoy ran through FCIC, NCIC, and DAVID.  (*Id.* at 13-14).  Deputy

McCoy could not recall whether Mr. Palmer produced proof of insurance.  (*Id.* at

16).  Through his inquiries, Deputy McCoy found that Mr. Palmer "had three

suspensions on his driver's license and that he had received [a] notice for each"

suspension.  (*Id.*).  Deputy McCoy, therefore, placed Mr. Palmer under arrest for

driving on a suspended license.  (*Id.* at 17).  Deputy McCoy maintained that

although he initially learned from Special Agent Younce that Mr. Palmer may have

a suspended license, Deputy McCoy performed his own independent investigation

and independently decided to stop Mr. Palmer and, ultimately, to arrest him.  (*See id.*

at 30-32, 34).

Deputy McCoy testified that at the time of the arrest, no one else was in the

vehicle, so Deputy McCoy intended to have the vehicle towed consistent with

standard procedures.  (*See id.* at 16-20).  To that end, Deputy McCoy needed to

conduct an inventory search to find items of value before turning the vehicle over to

the tow company.  (*Id.* at 20).  Because Deputy McCoy noticed that there were boxes

of mail throughout the vehicle, that the vehicle had a magnetic placard that read

"U.S. Postal Service," and that Mr. Palmer wore a hat reading the same, he called

the OIG to take custody of the mail.  (*Id.* at 17, 20-21).  Deputy McCoy explained to

Mr. Palmer that the car would be towed and asked what to do with the mail. (*Id.* at 21-22). Mr. Palmer directed Deputy McCoy to contact the post office, and Deputy McCoy did. (*Id.* at 21-22, 24). Deputy McCoy could not deliver the mail himself or leave it in the vehicle when the vehicle was towed. (*Id.* at 21). Additionally, he would not have been able to conclude an inventory search without opening the packages of mail and letters. (*Id.*).

Deputy McCoy initially stated at the scene that the OIG would perform the inventory search, but he testified at the hearing that he meant the agents would remove the mail so that he could perform the inventory search. (*Id.* at 23). After Deputy McCoy called the OIG, two special agents arrived and began removing mail from the vehicle. (*Id.* at 24-27). Deputy McCoy testified that the mail was located throughout the vehicle. (*Id.* at 26). Eventually, a representative from the local post office arrived with a van to take the mail so that it could be recirculated. (*Id.* at 27). Deputy McCoy testified that the postal employees were focused only on the mail. (*Id.*).

Deputy McCoy testified that after the mail was out of the vehicle, the postal employees took the mail and he remained at the scene. (*Id.* at 32). Deputy McCoy then concluded the inventory search, searching the entire vehicle consistent with standard procedures. (*Id.* at 32-34). Deputy McCoy noted that during the inventory search, he found marijuana and charged Mr. Palmer with possession of that controlled substance. (*Id.* at 33-34).

12

Deputy McCoy testified that his intent was to perform an inventory search, during which he would search anywhere where items of value could be located, including the center console, the glove box, and the trunk. (*Id.* at 23). Additionally, he clarified that every area that the postal employees searched was an area he would have searched. (*Id.* at 27-28). Furthermore, Deputy McCoy maintained that had he come across open mail during the inventory search, he would have turned it over to postal employees. (*Id.* at 29).

### ii. Cross-Examination

On cross-examination, Deputy McCoy testified that he had spoken to Special Agent Younce a few hours before the traffic stop. (*Id.* at 37, 38). Deputy McCoy noted that while Special Agent Younce provided relevant information, including that Mr. Palmer had a suspended driver's license, Special Agent Younce did not ask Deputy McCoy to stop Mr. Palmer. (*See id.* at 38). Deputy McCoy also testified that Special Agent Younce informed him that Mr. Palmer was being investigated for mail theft. (*Id.*). Deputy McCoy testified that he cannot recall whether he and Special Agent Younce discussed where she would be in the event of a traffic stop. (*Id.* at 39-40). However, Deputy McCoy clarified that he informed Special Agent Younce that he could not stop Mr. Palmer solely for the investigation and would need to "find" an independent reason to stop Mr. Palmer. (*Id.* at 40-41).

Deputy McCoy testified that, when stopped, Mr. Palmer did not pull into a parking spot, but instead stopped in the entrance to a gas station. (*Id.* at 42). Deputy

McCoy maintained that given the location of the vehicle, the vehicle needed to be towed pursuant to the Collier County Sheriff's Office's Operation's Manual Section 1.27.1(A) and (B).  (*Id.* at 46-47).  Deputy McCoy testified that he did not ask the owner of the gas station whether the vehicle could remain on the property and that he would neither allow Mr. Palmer to move the vehicle nor attempt to move it himself.  (*See id.* at 48-51).

Deputy McCoy acknowledged that Special Agents Younce and Morrison entered the vehicle to get the mail, but Deputy McCoy asserted that they did not conduct a search of the vehicle.  (*Id.* at 37-38, 43-44).  Deputy McCoy admitted that Special Agent Younce's job involves investigating crimes and that her job likely does not involve transporting mail.  (*Id.* at 44).

Deputy McCoy testified that he performed the inventory search before allowing the vehicle to be towed.  (*Id.* at 44-45, 52).  He acknowledged the importance of performing the inventory search consistent with standard procedure, and that the standard procedures require a Collier County Sheriff's Office deputy to conduct the inventory search.  (*Id.* at 51-52).

### iii.  Re-Direct Examination

On re-direct examination, Deputy McCoy testified that it is not the Collier County Sheriff's Office's policy to move a vehicle into a parking spot during a traffic stop or to ask a private business owner whether a vehicle could remain at the scene. (*Id.* at 56-57).

14

Further, Deputy McCoy testified that had the mail remained in the vehicle when it was towed, its delivery would have been delayed.  (*Id.* at 57-58).

Moreover, Deputy McCoy testified that had he found opened mail or a credit card in the name of another individual, its criminal nature would have been readily apparent to him and he would have reached out to the appropriate authority, consistent with standard procedures.  (*Id.* at 58-60).

Deputy McCoy further testified that had he performed the inventory search with the mail inside, he would have had to open each package.  (*Id.* at 60).  Deputy McCoy determined that based on the nature of the packages, it was preferable to contact postal employees.  (*Id.*).

      **b.**    **Special Agent Steve Morrison**

            **i.**  **Direct Examination**

On direct examination, Special Agent Steve Morrison testified that he had been employed as a Special Agent with the United States Postal Service, OIG since October 2012.  (*Id.* at 63).  Special Agent Morrison explained that because he is assigned to the internal mail theft team, his primary duties involve investigating allegations of potential mail theft involving postal employees and contractors.  (*Id.*).

Special Agent Morrison testified that on or about December 18, 2020, Special Agent Jill Younce involved him in an investigation of Mr. Palmer.  (*Id.* at 63-64).  On December 18, 2020, Special Agents Morrison and Younce arrived at the scene to secure good, deliverable mail and return it to the post office, which he has the

authority to do. (*Id.* at 64-65; *see also id.* at 66-67). When he arrived, Special Agent Morrison noted that the vehicle was parked in the entranceway to a gas station. (*Id.* at 81-82).

Special Agent Morrison testified that because Mr. Palmer's vehicle was a personal vehicle, the post office could not reclaim it. (*Id.* at 82). Additionally, Special Agent Morrison explained that if the car had broken down, the mail would need to be retrieved and recirculated for delivery. (*Id.* at 82-83).

Special Agent Morrison testified that he approached the opened driver's door of the vehicle and noticed a Victoria's Secret credit card on either the dashboard or the seat. (*Id.* at 65). He explained that he used the driver's door because it was already open and because the seat appeared to be the only area not filled with mail. (*Id.* at 66). Special Agent Morrison noted that the credit card was with a wallet but maintained he did not look in the wallet. (*Id.* at 65). Special Agent Morrison highlighted that the credit card was in the name of a female, the front still had the activation sticker, and the back was unsigned. (*Id.* at 65, 69-70).

Special Agent Morrison further testified that there was a large volume of mail throughout the car. (*See id.* at 66-67). Because Mr. Palmer's vehicle was being towed, the postal service needed to collect the mail, verify it was good mail, and return it to the post office supervisor to facilitate delivery. (*Id.* at 67, 68, 73-73). Additionally, because of the amount of mail, Special Agents Morrison and Younce called the local post office to send a vehicle to collect the mail. (*Id.* at 66-67). Once

the local post office representative – Mr. Michael Felix – arrived, Special Agent

Younce began pulling mail bins from the passenger side and Special Agent Morrison

began pulling bins from the driver's side.  (*Id.* at 67-68, 74).  Special Agent Morrison

clarified that the postal employees did not change or alter the state of any mail that

they encountered.  (*Id.* at 73).

      Special Agent Morrison testified that as they went through the mail to verify it

was good mail, Special Agents Younce and Morrison noticed problematic items.  (*Id.*

at 70).  Specifically, Special Agent Younce found a greeting card that had been

"rifled" or opened.  (*Id.* at 71).  Special Agent Morrison testified that, as shown in

Government's Exhibit 3g (Doc. 47-12), the greeting card was found on the

floorboard below the front passenger seat.  (*Id.* at 71-72).  Neither of the addresses on

the greeting card matched Mr. Palmer's address.  (*Id.* at 72-73).  Rather, it appeared

to be addressed to a customer on Mr. Palmer's route.  (*Id.* at 76).  Additionally, the

dates on the greeting card predated December 18, 2020.  (*Id.* at 73).

      Furthermore, Special Agent Morrison testified that as he, Special Agent

Younce, and Mr. Felix began to clear out the trunk of the vehicle, Special Agent

Morrison saw "some sort of a financial document" with numbers on it.  (*Id.* at 75).

He removed the document and saw that it was a check in the amount of $2,150.00.

(*Id.* at 75-76).  Special Agent Morrison noted that the check was not made out to or

from Mr. Palmer and that the address on the check appeared to belong to a customer

on Mr. Palmer's route.  (*Id.* at 76).  Additionally, the check was not in an envelope

and was dated November 17, 2020.  (*Id.* at 77).  Special Agent Morrison testified that when he read the check, it was apparent to him that the check was evidence of theft of mail or delay of mail.  (*Id.* at 77-78).

Special Agent Morrison testified that having found the $2,150.00 check, the Victoria's Secret credit card, and the greeting card, he returned to the front of the vehicle and opened the center console, where he discovered additional items.  (*Id.* at 78, 80).  Specifically, Special Agent Morrison testified that he found a check for over $5,000.00 dated December 8, 2020.  (*Id.* at 80).  Again, this check was made out neither to nor from Mr. Palmer but appeared to be associated with an address on Mr. Palmer's mail route.  (*Id.*).  Additionally, the check was not in an envelope.  (*Id.* at 81).  Special Agent Morrison also found marijuana in the center console.  (*Id.*).

Special Agent Morrison testified that if mail is undeliverable, the postal carrier must return the mail to the postal office that same day, so that it can be processed. (*Id.* at 78-79).  He explained that there are procedures for the post office to either return the mail to the sender or deliver the mail to the addressee.  (*Id.*).  Additionally, he noted that these procedures and requirements must be followed regardless of whether the postal carrier uses a personal vehicle or an official postal service vehicle. (*Id.* at 83-84).  Special Agent Morrison clarified that personal vehicles are also subject to inspection to ensure that no mail is left in the vehicle.  (*Id.* at 84).

### ii.  Cross-Examination

On cross-examination, Special Agent Morrison testified that before working for the OIG, he was an investigator with the Navy for four and a half years and has been a federal law enforcement investigator for twenty-three years. (*Id.* at 84-85). Accordingly, he acknowledged that he has substantial training in investigations. (*Id.*). Special Agent Morrison testified that when locating and securing evidence as part of an investigation, he is trained to photograph it frequently in the same location and way it was found. (*Id.* at 85).

Special Agent Morrison testified that he did not contemporaneously review Special Agent Younce's reports in this case but has since reviewed them. (*Id.* at 85-86). He noted that had he reviewed them contemporaneously, he would have suggested Special Agent Younce not refer to their involvement as an inventory search. (*Id.* at 86).

Special Agent Morrison explained that as a special agent for the OIG, he investigates mail theft but does not manage postal workers like Mr. Palmer. (*Id.* at 86-87).

Special Agent Morrison testified that he first learned of Mr. Palmer's investigation a few days before December 18, 2020. (*Id.* at 87). Special Agent Morrison testified that he knew that Special Agent Younce spoke to Deputy McCoy but that Special Agent Morrison did not participate in that conversation. (*Id.*). He maintained that he does not know what was said during the conversation, but he

knew it was possible that Deputy McCoy would stop Mr. Palmer.  (*Id.* at 87-88, 89).

Special Agent Morrison clarified that he did not know whether Mr. Palmer would be

stopped and did not have a plan if Mr. Palmer were stopped.  (*Id.* at 89-90).

Special Agent Morrison testified that on December 18, 2020, he and Special

Agent Younce conducted surveillance on Mr. Palmer by parking at various locations

on Mr. Palmer's route to ensure the route was being serviced properly.  (*Id.* at 88-89).

Special Agent Morrison clarified that he and Special Agent Younce were not

together at this time.  (*Id.* at 89).  Special Agent Morrison stated that at some point

he was told that Mr. Palmer had been stopped and he went to the scene.  (*Id.* at 90).

Special Agent Morrison testified that when he arrived at the scene, he

approached the vehicle, noticed the driver's side door was open, and looked inside.

(*Id.*).  He maintained that he first saw the Victoria's Secret credit card on the seat and

does not recall exactly where the wallet was.  (*Id.* at 91).  Special Agent Morrison

stated that he could not recall which side of the credit card was initially facing up and

that he picked the credit card up to look at it.  (*Id.* at 91, 93, 96-97).  Special Agent

Morrison acknowledged that the front of the credit card does not have a female's

name on it.  (*Id.* at 91-92).

Special Agent Morrison discussed the photo of the credit card, admitted as

Government Exhibit 3a (Doc. 47-6), and noted that the credit card and the

Cheesecake Factory gift card were photographed on top of the wallet.  (Tr. at 92).

Special Agent Morrison stated that the photograph does not show the credit card as it appeared on the driver's seat. (*Id.* at 92-93).

Special Agent Morrison testified that although Special Agent Younce's reports stated that the Victoria's Secret credit card was found in the wallet, the statement is not necessarily inaccurate. (*Id.* at 90-91). He explained that the credit card may have originally been found in the wallet by the Collier County Sheriff's Office deputies. (*Id.* at 93-95).

Special Agent Morrison also discussed the Government's Exhibit 3g (Doc. 47-12), which shows the rifled greeting card. (Tr. at 95). He testified that he did not find the greeting card and, therefore, does not know whether the photograph accurately depicts how it was found, but he noted that the greeting card was likely picked up and replaced before it was photographed. (*Id.* at 95-96).

Special Agent Morrison testified that he could not see the check found in the trunk until after the mail was removed. (*Id.* at 97). Nor could he see the check found in the center console or the marijuana until after he opened the console. (*Id.*). Finally, he acknowledged that he did not have a search warrant at any point. (*Id.* at 97-98).

### iii. Re-Direct Examination

On re-direct examination, Special Agent Morrison testified that there was no plan on December 18, 2020, but that he was aware of the possibility that Mr. Palmer could be stopped. (*Id.* at 98). Additionally, Special Agent Morrison clarified that in

conducting surveillance, he was essentially spot-checking Mr. Palmer's route.  (*Id.* at 98-99, 103).

Furthermore, Special Agent Morrison testified that his purpose in approaching the vehicle when he arrived on the scene was to evaluate the volume of deliverable mail.  (*Id.* at 99).  He maintained that taking photos and searching for evidence was not the focus.  (*Id.*).

Special Agent Morrison testified that the Victoria's Secret credit card was sitting in the seat by itself.  (*Id.*).  Special Agent Morrison maintained that both sides of the credit card show the nature of the store and that he would not expect Mr. Palmer to have a Victoria's Secret credit card.  (*Id.* at 99-100).

Special Agent Morrison testified that having found the credit card, the rifled greeting card, and the first check, he believed there would be additional items in the car.  (*Id.* at 100-01).  As a result, he decided to open the center console, which was closed but not locked.  (*Id.* at 101).

Special Agent Morrison noted that except for the marijuana and the check found in the center console, the items were found while trying to verify and recover live mail.  (*Id.*).  Special Agent Morrison testified that he determined the areas that contained mail from his initial look in the driver's seat door.  (*Id.* at 101-02).  He also testified that mail was visible before he leaned into the car.  (*Id.* at 102).

c.   **Supervisor Michael Felix**

i.  **Direct Examination**

On direct examination, Michael Felix testified that he is a supervisor at the Naples Main Post Office and has held that position for five and a half years.  (*Id.* at 108).  Mr. Felix explained that his duties and responsibilities include overseeing two rural delivery routes.  (*Id.*).

Mr. Felix testified that on December 18, 2020, Mr. Palmer was working as a rural carrier assistant, a position he had held for about a year and a half.  (*Id.* at 109).  Mr. Felix supervised Mr. Palmer during that time.  (*Id.*).  Mr. Felix noted that Mr. Palmer resided in the Miami area at the time.  (*Id.* at 109-10).

Mr. Felix explained that as a rural carrier assistant, Mr. Palmer was required to use a personal vehicle for his delivery route.  (*Id.*).  Mr. Felix testified that the rural carrier assistants must collect the mail in the morning, put it in order, deliver it, and account for any undeliverable mail.  (*Id.* at 110, 118).  Mr. Felix explained that at the end of the shift, a personal vehicle would need to be emptied, just as an official postal vehicle, and that supervisors will check the vehicles to ensure that they are empty.  (*Id.* at 110-11, 117-18).  Mr. Felix further explained that if a vehicle were to break down during the day or the mail carrier were otherwise unable to finish the route, Mr. Felix would make arrangements to ensure the mail is delivered that day.  (*Id.* at 111, 120).

Mr. Felix testified that on December 18, 2020, he received a message that Mr. Palmer was unable to finish his route and, therefore, he took a van to Mr. Palmer's location to collect the mail.  (*Id.* at 111-12).  When he arrived, Mr. Felix noticed that there were two postal inspectors present and that Mr. Palmer's vehicle was full of mail.  (*Id.* at 112).  Mr. Felix then spoke to the OIG special agents and made arrangements to ensure the mail could be delivered.  (*Id.* at 113-14).  Mr. Felix and the special agents removed the mail from Mr. Palmer's vehicle and transferred it to the van that Mr. Felix had brought.  (*Id.* at 114).  While unloading Mr. Palmer's vehicle, Mr. Felix noted that there were checks that were not in an envelope, noting that one was "in the back of the truck [sic] and [one] was . . . in the back seat area of the truck [sic] or on the floor in the back seat."  (*Id.* at 115).  Mr. Felix noted that the checks appeared to be opened mail because they were not recent and were not in envelopes.  (*Id.*).  Mr. Felix clarified that these checks were in the same areas as the mail that he was removing.  (*Id.* at 115, 117).  Additionally, Mr. Felix testified that his only intent was to remove the mail so that it could be delivered.  (*Id.* at 119).

Mr. Felix acknowledged that the mail could not have been left in the vehicle when the vehicle was towed because the postal service is committed to ensuring delivery of every piece of mail and that only postal service employees can take the mail.  (*Id.* at 120).  Additionally, Mr. Felix testified that had he removed the mail by himself, it would have taken longer to have the mail put back into circulation.  (*Id.* at

115).  Mr. Felix also noted that had he found the checks himself, he would have reported them to his manager and probably the OIG.  (*Id.* at 116).

### ii.  Cross-Examination

On cross-examination, Mr. Felix testified that the Sheriff's Office deputies and the OIG special agents were already on the scene when he arrived.  (*Id.* at 121).  He noted that the vehicle was open, but no mail had been removed.  (*Id.*).  Mr. Felix estimated that he arrived at the scene about fifteen to twenty minutes after receiving the call that Mr. Palmer could not complete his route.  (*Id.* at 122).

Mr. Felix explained that he does not typically work with the OIG special agents but if he needs to, he cooperates.  (*Id.*).

Mr. Felix testified that he periodically checked Mr. Palmer's vehicle but that the inspectors would not have done periodic checks.  (*Id.* at 123).

Mr. Felix clarified that someone opened the center console, where one of the checks was found.  (*Id.* at 123-24).  However, he noted that the other check was visible after the mail was removed.  (*Id.* at 124).  Mr. Felix clarified that he believes the special agents noticed the check in the back seat first but cannot recall for sure.  (*Id.*).

### d.  Special Agent Jill Younce

### i.  Direct Examination

On direct examination, Special Agent Jill Younce testified that she has been a special agent with the United States Postal Service, OIG since 2001.  (*Id.* at 126).

She explained that as a member of the internal mail theft team, her general job duties involve conducting internal investigations with United States postal employees. (*Id.*).  Additionally, she testified that as an employee of the OIG, she can reclaim and examine mail to determine whether its opened or delayed mail.  (*Id.* at 131). Moreover, Special Agent Younce testified that as an employee of the OIG, she could not leave the mail in the vehicle; the mail needed to be returned to the post office for recirculation.  (*Id.* at 134).

Special Agent Younce testified that on or around December 7, 2020, she received a complaint from a postal customer on Mr. Palmer's route, complaining that he or she did not receive a signature confirmation parcel, despite the records showing that it was delivered.  (*Id.* at 126-27).[6]

Special Agent Younce testified that with this information, she began to run a series of checks on Mr. Palmer.  (*Id.*).  During these checks, Special Agent Younce discovered that Mr. Palmer potentially had a suspended driver's license.  (*Id.* at 127-29).  Because she does not typically handle suspended driver's licenses, Special Agent Younce notified Deputy McCoy that Mr. Palmer had a suspended license, provided him with Mr. Palmer's name, date of birth, type of vehicle, and route, and informed him that Mr. Palmer was a postal worker under investigation.  (*Id.* at 129-30).

---

[6] Special Agent Younce explained that a signature confirmation parcel requires that the customer sign for the parcel upon delivery.  (Tr. at 127).

Special Agent Younce contacted Deputy McCoy again to let him know where Mr. Palmer was likely going to be on December 18, 2020.  (*Id.* at 130).

Special Agent Younce testified that Deputy McCoy ultimately called her and informed her that Mr. Palmer was under arrest and that there was a lot of mail in the vehicle.  (*Id.* at 131).  Special Agent Younce arrived on the scene and saw Mr. Palmer's vehicle parked in the entranceway to a gas station.  (*Id.* at 131-32).  She noted that she knew that the vehicle was being towed but had no role in making that decision.  (*Id.* at 133).  Special Agent Younce testified that her reason for arriving at the scene was to "examine and retrieve the mail" to either take it back to the post office or further investigate.  (*Id.* at 132-33).

Special Agent Younce testified that after speaking with Deputy McCoy, she approached the vehicle and opened the passenger door, where she saw mail in the seat and on the floorboard.  (*Id.* at 132).  She did not notice the mail before opening the door, but she knew there was mail in the vehicle.  (*Id.*).  Having opened the door and seen the amount of mail, Special Agent Younce called Mr. Felix to help retrieve the mail.  (*Id.* at 133-34).

Special Agent Younce testified that before Mr. Felix arrived, she pulled two tubs of mail out of the front seat and confirmed that it was not Mr. Palmer's personal mail.  (*Id.* at 134-35, 137-38).  In doing so, Special Agent Younce noticed an opened greeting card wedged between the passenger seat and the side of the vehicle.  (*Id.* at 135).  Special Agent Younce testified that the envelope was in plain view and plainly

opened. (*Id.*). Thus, she brought Special Agent Morrison over to see the envelope. (*Id.*). Special Agent Younce testified that her attention was drawn to the envelope because it was opened. (*Id.* at 136). Special Agent Younce noted that a postal carrier is not allowed to have open mail in his or her vehicle, especially if it is not addressed to the carrier. (*Id.* at 137).

Special Agent Younce stated that nothing else was removed from the vehicle until Mr. Felix arrived to help get the mail recirculated. (*Id.* at 137-38). Once Mr. Felix arrived and they determined how to organize the mail in the van, Special Agent Younce began to enter areas of the vehicle where the mail was visible, including the front seat, the floorboards, the back seat, and the trunk. (*Id.* at 138-39). Special Agent Younce testified that while removing the mail, Special Agent Morrison found a check in plain view that was not in an envelope. (*Id.* at 139). Special Agent Younce noticed that the check was not made out to or from Mr. Palmer; rather, the address matched a customer on Mr. Palmer's route. (*Id.* at 140). Additionally, the check was dated in November. (*Id.*). Special Agent Younce testified that it was readily apparent that the check could be evidence of mail theft, opening mail, and/or delay of mail. (*Id.* at 140-41).

Further, Special Agent Younce testified that after finding this check, Special Agent Morrison found another check in the center console. (*Id.* at 141). The second check, in the amount of approximately $5,000.00, was again not in an envelope, not made out to or from Mr. Palmer, and appeared to belong to someone on Mr.

Palmer's route.  (*Id.* at 141).  Special Agent Younce asserted that it was readily apparent that this check was evidence of a crime.  (*Id.* at 141-42).

Special Agent Younce testified that a Victoria's Secret credit card was also found in Mr. Palmer's vehicle, but that the credit card was not in Mr. Palmer's name.  (*Id.* at 142).  Special Agent Younce later reached out to the persons whose names were on the checks and the Victoria's Secret credit card.  (*Id.*).

Special Agent Younce further testified that the mail could not have been left in Mr. Palmer's vehicle and that the mail did not belong to Mr. Palmer.  (*Id.* at 143-44).  Additionally, she noted that the postal service has policies for carriers, including a policy that mail cannot be left in a personal vehicle and that undelivered mail must be returned each night.  (*Id.* at 142-44).

### ii.  Cross-Examination

On cross-examination, Special Agent Younce testified that she first received the complaint of the missing parcel on December 7, 2020, and began investigating Mr. Palmer around that time.  (*Id.* at 144-45).  She explained that she first contacted Deputy McCoy on December 18, 2020, to advise him that Mr. Palmer had a suspended driver's license and inform Deputy McCoy of Mr. Palmer's general location.  (*Id.* at 146).  Special Agent Younce clarified that while she informed Deputy McCoy that Mr. Palmer had a suspended license, it was Deputy McCoy's decision to stop Mr. Palmer.  (*Id.* at 156-57).  Additionally, Special Agent Younce

testified that she was "doing drivebys" to ensure that Mr. Palmer was servicing his delivery route.  (*Id.* at 146-47, 157).

Special Agent Younce admitted that she had not applied for a search warrant and did not have a search warrant for Mr. Palmer's vehicle.  (*Id.* at 147).

Special Agent Younce testified that while she previously testified before the Grand Jury that she "assisted with" the inventory search, she clarified at the hearing before the Undersigned that she "assisted as far as [she], basically, recovered the mail" and that the Collier County Sheriff's Office conducted the inventory search.  (*Id.* at 147-48).  Likewise, Special Agent Younce testified that while she previously stated in her report that she was part of the inventory search, this "was a poor choice of words" because she did not actually conduct the inventory search.  (*Id.*).  Rather, she clarified that she was "inventorying what mail [they] have and what are [they] looking at."  (*Id.* at 148-49).

Special Agent Younce testified that after speaking to Deputy McCoy she approached the vehicle and opened the door.  (*Id.* at 149).  Special Agent Younce noted that at this time Special Agent Morrison was already in the vehicle.  (*Id.*).  Additionally, Special Agent Younce noted that she wore gloves when collecting the mail but explained that the gloves were a COVID precaution.  (*Id.*).

Special Agent Younce testified that she opened the passenger door and saw the copious amounts of mail and the greeting card wedged between the seat and the door.  (*Id.* at 149-50).  Special Agent Younce admitted that when she opened the door, she could not read either address on the envelope but she could see that the

flap was open.  (*Id.* at 150-51).  Special Agent Younce explained that she picked the
envelope up, realized it was not addressed to Mr. Palmer, and then placed it in the
"approximate area" where she found it to photograph it.  (*Id.* at 151).  Special Agent
Younce admitted that when the greeting card was photographed, it was for
"evidentiary purposes" and was part of an investigation.  (*Id.* at 151-52).  Special
Agent Younce conceded that she needed to remove the greeting card to determine
whether it was addressed to Mr. Palmer because it was not obvious when the door
was opened.  (*Id.* at 152-53).

Special Agent Younce testified that she believes the Victoria's Secret credit
card was found on top of the wallet on the dashboard.  (*Id.* at 153).  However, when
confronted with her Grand Jury testimony and her reports, Special Agent Younce
acknowledged that she had previously stated that the Victoria's Secret credit card
was found in the wallet.  (*Id.* at 153-54).  Special Agent Younce stated that the
Victoria's Secret credit card and the Cheesecake Factory gift card were placed on the
wallet to be photographed.  (*Id.* at 154-55).

Special Agent Younce testified that Special Agent Morrison found the check
in the trunk after the boxes of mail were removed and that he found the check in the
console after it was opened.  (*Id.* at 155).

Special Agent Younce noted that although her purpose at the scene was to
retrieve the mail, she was also investigating Mr. Palmer.  (*Id.* at 155-56).

Special Agent Younce clarified that her job is to investigate internal mail theft
and she does not manage employees or perform periodic searches.  (*Id.* at 145).

### iii.  Re-Direct Examination

On re-direct examination, Special Agent Younce testified that when she saw the greeting card it was immediately apparent that the envelope was open, and the greeting card was near the mail.  (*Id.* at 158).  Special Agent Younce maintained that she would not expect to see an open envelope in a mail carrier's vehicle.  (*Id.*).

Special Agent Younce also testified that the check found in the trunk was visible when the mail was removed.  (*Id.* at 158-59).  She noted that at the time the check was found, Mr. Felix was on the scene.  (*Id.* at 159).  Additionally, Special Agent Younce stated that nothing prohibits her from carrying mail from Mr. Palmer's car to the van Mr. Felix brought.  (*Id.*).  Likewise, she testified that nothing would prohibit her from looking at the mail once it had been removed from the vehicle.  (*Id.* at 160-61).

Special Agent Younce clarified that she never told Deputy McCoy to stop Mr. Palmer or that she wanted the vehicle towed and that she never directed Deputy McCoy to conduct an inventory search.  (*Id.* at 159-60).  Additionally, Special Agent Younce testified that she did not choose the location of the stop and that she did not know where Mr. Palmer had been stopped until Deputy McCoy called.  (*Id.* at 160).

Finally, Special Agent Younce testified that once she saw the opened greeting card, she had concern that there was additional opened, rifled, or delayed mail.  (*Id.*).

## IV.   Analysis

In addressing the issues raised by the parties, the Undersigned first addresses whether Defendant has standing to contest the alleged violations.  Second, the Undersigned considers whether the initial stop and the arrest were lawful.  Finally, the Undersigned evaluates whether the ultimate searches and seizures were lawful.

### a.   Standing

As a preliminary matter, Defendant must establish standing to challenge the validity of the search and seizure.  *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000).  Indeed, the Fourth Amendment only prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV.  As a result, "only individuals who have a legitimate expectation of privacy in the area invaded have standing to invoke the protections of the Fourth Amendment."  *United States v. Vasquez-Padilla*, 330 F. App'x 883, 887 (11th Cir. 2009) (citing *Smith v. Maryland,* 442 U.S. 735, 740 (1979); *Cooper*, 203 F.3d at 1284).  Moreover, "Fourth Amendment rights . . . are personal."  *Cooper*, 203 F.3d at 1284 (citation omitted).  Thus, "only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search."  *Id.* (citation omitted).

An individual has a legitimate expectation of privacy under the Fourth Amendment if he or she (1) exhibits an actual expectation of privacy and (2) the privacy expectation is one that society is prepared to recognize as reasonable.  *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006) (citations omitted).

Thus, to establish standing to challenge the validity of a government search, an individual must demonstrate both a subjective and an objective expectation of privacy. *Id.*

The parties neither briefed the issue of standing nor presented argument at the hearing on the issue. Nevertheless, after careful review of the evidence presented at the suppression hearing and the parties' briefing regarding the circumstances surrounding the searches and seizures, the Undersigned finds that Defendant has sufficiently established standing as the owner of the vehicle, present at the time of the searches and seizures. *See United States v. Delgado*, 903 F.2d 1495, 1503 n.3 (11th Cir. 1990) (noting that the owner of the vehicle had standing to challenge the search of the vehicle); *United States v. Baker*, 719 F.3d 313, 320 (4th Cir. 2013) (finding that a defendant "of course ha[d] standing to challenge the search of his own vehicle"); *United States v. Abrams*, 494 F. Supp. 2d 657, 661 (S.D. Ohio 2005) (noting that "neither the Sixth Circuit nor any other court has suggested that the owner of an automobile who occupied it when it was stopped was without standing to challenge its search"); *Cf. United States v. Olbel*, No. 06-60344-CR, 2007 WL 9754575, at *3 (S.D. Fla. Aug. 28, 2007), *aff'd,* 275 F. App'x 910 (11th Cir. 2008) (citations omitted).

**b.    Initial Stop and Arrest**

Although Defendant's motion does not expressly argue that Deputy McCoy's traffic stop or decision to arrest Defendant was illegal, Defense counsel's questions at the suppression hearing implied as much. Accordingly, the Undersigned briefly

addresses the facts and legal authority that apply to traffic stops and subsequent arrests.

"Under the Fourth Amendment, a decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation occurred." *U.S. v. Simmons,* 172 F.3d 775, 778 (11th Cir. 1999) (citing *Whren v. United States,* 517 U.S. 806, 810-12 (1996)).  Importantly, "an officer's motive in making the traffic stop does not invalidate what is otherwise 'objectively justifiable behavior under the Fourth Amendment.'" *Id.* (quoting *Whren,* 517 U.S. at 812; citing *United States v. Roy,* 869 F.2d 1427, 1431-33 (11th Cir. 1989), *cert. denied* 493 U.S. 818 (1989)).

Under Florida law, "[t]he operation of any motor vehicle without having attached thereto a registration license plate and validation stickers . . . for the current registration period" constitutes a traffic violation.  Fla. Stat. § 320.07(3).  Likewise driving with a suspended license constitutes a moving violation.  Fla. Stat. § 322.34(1).  Moreover, a person knowingly driving with a suspended license may be guilty of a misdemeanor or felony, depending on the circumstances.  *See* Fla. Stat. § 322.34(2).

At the hearing, Deputy McCoy testified that he stopped Mr. Palmer based on both the expired registration and driving with a suspended driver's license.  (Tr. at 32).  Additionally, Officer McCoy testified that both offenses are offenses for which he may pull over a vehicle.  (*Id.* at 14).  Moreover, Deputy McCoy testified that although he initially received information from the OIG that Mr. Palmer may have a

35

suspended license, he independently investigated and determined that a traffic violation occurred.  (*Id.* at 28-29).

Upon consideration of Deputy McCoy's testimony and the parties' briefing, the Undersigned finds that Deputy Palmer had probable cause to believe that a traffic violation occurred.  (*See id.*).  Thus, the traffic stop was valid, regardless of any subjective motive Deputy McCoy may have had.  *See Simmons,* 172 F.3d at 778.

Next, the Undersigned considers whether Defendant's arrest was lawful.

"When officers have probable cause to believe that a person has committed a crime in their presence, the Fourth Amendment permits them to make an arrest, and to search the suspect in order to safeguard evidence and ensure their own safety." *Virginia v. Moore,* 553 U.S. 164, 178 (2008).  Additionally, "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution." *Id.* at 176.

Because Deputy McCoy observed Mr. Palmer driving with a suspended driver's license, (Tr. at 41-42), Deputy McCoy had probable cause to arrest Mr. Palmer under Fla. Stat. § 322.34(2).  *See Jean v. United States*, No. 2:15-cv-803-FtM-29UAM, 2019 WL 1402168, at *4 (M.D. Fla. Mar. 28, 2019) (citations omitted)).[7] Accordingly, the Undersigned finds that Mr. Palmer's arrest was lawful.  *See id.*

---

[7]  Deputy McCoy testified that through his investigation, he determined that Mr. Palmer "had three suspensions on his driver's license and that he had received [a] notice for each."  (Tr. at 16).

c.    Searches and Seizures

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

The text of the Constitution provides two basic requirements.  First, "all searches and seizures must be reasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011).  "[R]easonableness generally requires . . . obtaining . . . a judicial warrant." *Riley v. California*, 573 U.S. 373, 382 (2014) (quotation omitted).  To that end, the Supreme Court has held that a search or seizure conducted without a judicial warrant is *per se* unreasonable under the Fourth Amendment.  *City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015) (citations omitted).  Nevertheless, there are certain "established and well-delineated exceptions" to this rule, and a warrantless search or seizure is reasonable only if it falls within a recognized exception.  *Id.* (citations omitted).  The government bears the burden of establishing that the case falls within one of the exceptions and that the search and seizure were in fact reasonable.  *United States v. Bachner*, 706 F.2d 1121, 1126 (11th Cir. 1983) (citation omitted).

The Government argues that the evidence seized from Mr. Palmer's vehicle is admissible under a combination of the inventory search exception, the plain view doctrine, and the automobile exception, or, alternatively, under the inevitable

discovery doctrine.  (Doc. 31 at 8-11; Tr. at 162-71).  The Undersigned addresses each argued exception in chronological sequence against the facts that implicate the exceptions.

### 1.    Inventory Search Exception

The Undersigned first considers the Government's argument that the warrantless search was reasonable under the inventory search exception.  (Tr. at 163-78, 190-94).

The Eleventh Circuit has held that "[t]o satisfy the so-called inventory search exception to the warrant requirement, the government bears the burden to demonstrate that the officers possessed the authority to impound the vehicle and followed departmental policy in conducting the search."  *See United States v. Witten*, 649 F. App'x 880, 886 (11th Cir. 2016) (citation omitted).  Thus, "[i]f a search is to be upheld under the inventory search doctrine, . . . the police must first have the authority to impound the vehicle and must then follow the procedures outlined in the policy."  *United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991).  "If the vehicle has been impounded lawfully, an officer may conduct an inventory search, including a search of closed containers, 'provided the search is conducted pursuant to standardized criteria.'"  *Witten*, 649 F. App'x at 886 (quoting *Williams*, 936 F.2d at 1248).

The Supreme Court has provided three justifications for the warrantless search of a vehicle under the inventory exception:  (1) "the protection of the owner's property while it remains in police custody;" (2) "the protection of the police against

38

claims or disputes over lost or stolen property;" and (3) "the protection of the police from potential danger." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (citations omitted). Thus, the inventory search exception is "not meant as [an] investigatory technique" but rather to protect an individual's possessions and protect the police. *Williams*, 936 F.2d at 1248. Nevertheless, "the mere expectation of uncovering evidence will not vitiate an otherwise valid inventory search" so long as the inventory search did not serve as a pretext for an investigatory search. *United States v. Bosby*, 675 F.2d 1174, 1179 (11th Cir. 1982) (citation omitted).

As to whether the decision to perform the inventory search was made pursuant to standard procedures, Deputy McCoy testified that paragraphs A and B of Section 1.27.1 of the Collier County Sheriff's Office's Operations Manual required Mr. Palmer's vehicle to be impounded. (*See* Tr. at 47). The Collier County Sheriff's Office's Operations Manual, provides in relevant part that a deputy of the Collier County Sheriff's Office "shall impound a vehicle if:" (A) the "[o]wner [of the vehicle] is arrested and has no means to remove the vehicle if located on public property or private property without consent of the owner;" or (B) the "[v]ehicle is unattended and illegally parked or otherwise obstructing traffic." (Doc. 47-16 at 2).

As to the first part of paragraph A – whether the owner has been arrested – for the reasons addressed fully above, the Undersigned finds that Mr. Palmer was lawfully arrested because Deputy McCoy had probable cause to arrest Mr. Palmer for violating Fla. Stat. § 322.34(2). *See Jean*, 2019 WL 1402168, at *4. Thus, the Undersigned considers whether the second part of paragraph A is satisfied—*i.e.*,

whether the vehicle was located on public property or private property without the consent of the property owner. (*See* Doc. 47-16 at 2).

Defense counsel's questions at the hearing implied that Defendant argues that this portion of the provision cannot be met. (*See* Tr. at 47-49). Specifically, Defense counsel questioned Deputy McCoy as to whether he sought permission from the owner of the Circle K – the parking lot in which Mr. Palmer stopped – for Mr. Palmer's vehicle to remain. (*See id*. at 48). Deputy McCoy testified that although he did not ask the owner whether Mr. Palmer's vehicle could remain at the scene, (*id*.), it is not the Collier County Sheriff's Office's policy to do so when the private property is a business, (*id*. at 56). Rather, Deputy McCoy explained that paragraph A addresses the scenario in which the arrest occurs while a vehicle is stopped at a private residence. (*Id*. at 56-57). Defendant did not controvert this testimony.

Upon consideration of the Collier County Sheriff's Office's Operations Manual and Deputy McCoy's testimony, the Undersigned finds that the impoundment was lawful. Specifically, because Mr. Palmer was lawfully arrested, Section 1.27.1(A) of the Operations Manual was implicated. (*See* Doc. 47-16 at 2). Additionally, Deputy McCoy's testimony satisfies the Undersigned that Deputy McCoy's decision not to ask the owner of the business whether the vehicle could remain at the scene accorded with standard operating procedures. (*See* Tr. at 56-57). Thus, the Undersigned finds that Deputy McCoy had the authority to impound the vehicle. *See Williams*, 936 F.2d at 1248.

40

Alternatively, the Undersigned also finds that the decision to impound the vehicle was lawful under paragraph B of Section 1.27.1 of the Operations Manual. In light of Mr. Palmer's lawful arrest, the vehicle would be unattended because no one else with ownership was present to move the vehicle. (*See* Tr. at 47). Additionally, the uncontroverted testimony demonstrates that the vehicle was obstructing traffic because it was parked in the entryway to the gas station. (*See, e.g.*, *id*. at 19, 81-82, 132). Although defense counsel suggested that the Collier County Sheriff's Office could have moved the vehicle to a parking spot, (*id.* at 49-50), Deputy McCoy's uncontroverted testimony demonstrates that doing this would not have accorded with the Sheriff's Office's standard operating procedures, (*see id*. at 50-51, 56). Accordingly, the Undersigned finds that the decision to impound the vehicle was authorized under either paragraph A or B of Section 1.27.1 of the Collier County Sheriff's Office's Operations Manual.

Having found that Deputy McCoy had the lawful authority to impound the vehicle, the Undersigned considers whether Deputy McCoy had the authority to conduct an inventory search and whether the search itself complied with the policy. *See Witten*, 649 F. App'x at 886.

In that regard, Defendant argues that the search violated the Collier County Sheriff's Office's standard procedures because Deputy McCoy included agents of the OIG in the inventory search. (*See, e.g.*, Doc. 38 at 6; Tr. at 181, 182). In support, Defendant relies on Section 1.27.3(B) of the Collier County Sheriff's Office's Operations Manual, (*see* Doc. 38 at 6), which states that "[Collier County Sheriff's

Office] *Deputies* shall make an inventory search of each impounded vehicle if they reasonably believe such search would meet the objectives of the policy," (Doc. 47-12 at 3 (emphasis added)).  Defendant argues that by allowing OIG Special Agents Morrison and Younce to participate in the inventory search, Deputy McCoy failed to comply with the literal terms of the policy and, therefore, the inventory search was invalid.  (Doc. 38 at 6; *see also* Tr. at 181, 182).

The Undersigned finds that the warrantless search here was reasonable under the inventory search exception.  Specifically, as discussed fully below, the Undersigned finds that although Deputy McCoy did not follow the literal language of the standard procedures when he allowed the OIG agents to remove mail from the car, such a deviation was reasonable under the facts and circumstances of this case.

As an initial matter, the Eleventh Circuit, and district courts within the Eleventh Circuit, have routinely held that a deviation from the standard procedure requiring an officer to complete a written inventory form does not necessarily convert an otherwise lawful inventory search into an unlawful search.  *See, e.g.*, *United States v. Westerman*, 418 F. App'x 822, 823 (11th Cir. 2011) ("An officer's failure to complete a written inventory form does not necessarily invalidate an inventory search."); *United States v. O'Bryant*, 775 F.2d 1528, 1534 (11th Cir. 1985) (concluding that the "failure to compile a complete written inventory of the briefcase's contents" did not render the inventory search invalid); *United States v. Petit*, No. 2:16-CR-00319-AKK-JHE-2, 2017 WL 2060005, at *4 n.3 (N.D. Ala. Mar. 19, 2017), *report and recommendation adopted*, No. 2:16-CR-0319-AKK, 2017 WL 2001705 n.3 (N.D. Ala.

May 12, 2017). (The "Eleventh Circuit has held the validity of an inventory search is not necessarily nullified by [the] fact" that an inventory form was not completed.); *United States v. Pinder*, No. 1:08-CR-42103-MHS-AJB, 2009 WL 10670633, at *18 (N.D. Ga. Dec. 23, 2009), *report and recommendation adopted*, No. 1:08-CR-421-03-MHS, 2010 WL 11507903 (N.D. Ga. Mar. 5, 2010), *aff'd*, 437 F. App'x 816 (11th Cir. 2011) (noting that while the failure to fill out an impound slip may indicate an improper motive rather than a valid inventory search, "a finding of pretext where there are record keeping deficiencies is not automatic").

Although the cited cases are distinguishable from the instant case in that they discuss the effect of an officer's failure to properly fill out an inventory sheet, the Undersigned finds the reasoning underlying these decisions sufficiently applicable to the instant case.  Specifically, the cited cases highlight that a slight deviation from the standard procedure does not necessarily render a search invalid.  *See id.*  Rather, the cases essentially consider whether the failure to properly fill out the inventory sheet rendered the search unreasonable or a pretext for an investigative search.  *See id.*  As the Eleventh Circuit has observed, "the legitimacy of the search . . . turns on its reasonableness in light of the community caretaking functions that allow inventory searches."  *U.S. v. Laing*, 708 F.2d 1568, 1570 (11th Cir. 1983) (citations omitted). To that end, although a showing that the search complied with the standard practice for the particular law enforcement is one of the strongest indications of reasonableness, the reasonableness of the search ultimately "depends on the particular facts and circumstances."  *Id.* (citation omitted).  In light of this, "the

Court must evaluate the type of deficiencies and the officer's testimony in the context of the particular facts of the case to determine whether the search was a pretext." *Pinder*, 2009 WL 10670633, at *18, *report and recommendation adopted*, 2010 WL 11507903, *aff'd*, 437 F. App'x 816.

In this instance, Deputy McCoy testified that he was unable to perform his inventory search until the mail was removed.  (Tr. at 23, 33).  Although defense counsel's questions appear to imply that the inventory search did not begin until the mail was removed, (*id*. at 55), the Undersigned finds that the decision to inventory the vehicle was made at the time the car was impounded, and the need to remove the mail was part of the inventory search.

Moreover, the decision to have the postal employees remove the mail was both reasonable under the circumstances and consistent with the Supreme Court's justifications for the inventory search exception.  As noted above, the three justifications for this exception are:  (1) to protect the owners from having their possessions stolen or damaged; (2) to protect the officers from claims of stolen or damaged property; and (3) to protect the safety of the officers.  *See Opperman*, 428 U.S. at 369; (*see also* Doc. 47-16 at 3).  Consistent with the second justification – to protect the officers from claims of stolen or damaged property – the Collier County Sheriff's Office's Operations Manual requires the deputies to open all opened and closed containers during the inventory search.  (*See* Doc. 47-16 at 3).  Thus, as Deputy McCoy testified, he would have had to open every piece of mail in the vehicle as part of an inventory search.  (Tr. at 60).  Based on the facts and

circumstances surrounding the inventory search – including the nature of Mr. Palmer's employment – Deputy McCoy testified that he did not want the responsibility of opening the packages and, therefore, notified the postal service that the packages were there.  (*Id.*).  By allowing the postal service to retrieve the mail that was clearly entrusted to the post office for delivery to customers, Deputy McCoy's deviation from the standard procedures was wholly consistent with the aim of protecting the officers from claims of stolen or damaged property.  *See Laing*, 708 F.2d at 1571 (affirming the denial of a motion to suppress and rejecting the defendant's argument that opening a closed container exceeded the scope of the inventory search because "[t]h[e] intrusion was justified by the purposes of an inventory search, especially the need to protect the police from claims pertaining to lost or stolen property").  Specifically, by allowing the live mail to return to the post office and ultimately be recirculated for delivery, Deputy McCoy substantially lessened the risk of claims and disputes over lost, stolen, or damaged mail.  Thus, the Undersigned finds the slight deviation in allowing Special Agents Morrison and Younce to be present in connection with the inventory search for the limited purpose of removing live mail did not render the search unreasonable under the circumstances.  *See id*.

While the parties did not cite, and the Undersigned has not found, an analogous case by or within the Eleventh Circuit, two Fifth Circuit decisions are sufficiently analogous and instructive.

In *United States v. Hahn,* 922 F.2d 243 (5th Cir. 1991), the Fifth Circuit vacated and remanded an Order denying a motion to suppress.  The defendant was arrested by Internal Revenue Service ("IRS") agents, but the agents did not conduct an inventory search of the vehicle.  *Id.* at 244.  The defendant's vehicle was then impounded with the assistance of local police.  *Id.*  Subsequently, an IRS agent returned to the vehicle and performed an inventory search of the vehicle and seized several items.  *Id.* at 244-45.  In vacating the denial of the motion to suppress, the Fifth Circuit noted that (1) although the search complied with the local police procedures, the IRS had no procedures of their own and there was no evidence that the agents were aware of the local police's procedures; (2) there was no evidence that the IRS conducted the search on behalf of or with the knowledge of the local police; and (3) there was no evidence that the local police procedures purported to govern inventory searches by federal officials.  *Id.* at 247.  The Fifth Circuit concluded that the search was not a valid inventory search because the requisite "nexus" between the standard procedures and the search was "necessarily lacking where . . . not only [were] the procedures not applicable to the particular search, but also the officers conducting the search do so in total unawareness of such (or any other) procedures and as if no standardized procedures governed their conduct."  *Id.*

In contrast, relying in part on *Hahn*, the Fifth Circuit affirmed a denial of a motion to suppress in *United States v. Gallo*, 927 F.2d 815, 820 n.2 (5th Cir. 1991).  In *Gallo*, a local police officer stopped and arrested the defendant for driving with a suspended license and impounded the vehicle.  *Id.* at 818.  During an inventory

search, the officer found a closed cardboard box, which contained "thin packets wrapped in aluminum foil." *Id.* The officer neither inventoried the contents of the box nor investigated the contents of the aluminum foil packets. *Id.* The vehicle was taken to the police station, where Drug Enforcement Agency ("DEA") agents searched the box and discovered $299,985.00 in U.S. currency wrapped in the aluminum foil. *Id.* The Fifth Circuit determined that although the DEA agent, rather than local police, inventoried the contents of the packets, the inventory search was nonetheless valid. *Id.* at 819-20, 820 n.2. Specifically, the Fifth Circuit determined that the local police had the authority to conduct the search, the search conformed to the police's standard procedures, and the DEA agent was acting on behalf of, and with the knowledge of, the local police officer. *Id.* at 820 n.2. Accordingly, the Fifth Circuit distinguished the case from *Hahn* and held that the inventory search was valid. *Id.*

As in *Gallo*, the OIG agents in the instant case acted with the knowledge of – and in the presence of – the local police. (*See* Tr. at 24 (Deputy McCoy testifying that he remained on the scene the entire time); Tr. at 23-26 (Deputy McCoy testifying that he contacted Special Agent Younce to have the mail removed)). Although there is no testimony that the OIG agents' search complied with the Collier County Sheriff's Office's standard procedures – and, in fact, it did not because the closed containers and mail were not opened – the Undersigned does not find these facts to be determinative. Rather, as addressed above, the decision to

47

deviate from the standard procedures by not opening the mail supports the justification for the inventory search exception.  *See Laing*, 708 F.2d at 1571.

Moreover, unlike in *Gallo* or *Hahn*, the OIG agents were not engaging in a true search of the vehicle.  Rather, they were simply removing the live mail to ensure that Deputy McCoy could adequately and efficiently perform the inventory search and to ensure that the mail was timely delivered to postal customers.  Such a finding is supported by Agent Morrison's testimony that he did not open the center console until after he found the opened mail.  (Tr. at 51 ("Prior, since I was dealing with just mail, I hadn't even opened the center console in the vehicle.")).  Likewise, both Special Agents Morrison and Younce testified that the purpose of their presence at the scene and entering the vehicle was merely to verify and recover live mail, not to search for evidence.  (*Id.* at 99, 134, 136, 155-56).  The OIG agents' testimony is further corroborated by Deputy McCoy who testified that the agents "were there solely for the mail."  (*Id.* at 27).

Ultimately, the Undersigned finds that Special Agents Morrison's and Younce's participation was limited to retrieving mail, which they had the authority to do.  (*See id.* at 64-65 (Special Agent Morrison testifying that he has authority to take custody of the mail); *id.* at 159 (Special Agent Younce testifying that nothing prohibits her from removing the mail from Mr. Palmer's van and placing it in the postal van)).  The fact that the officers were also investigating Mr. Palmer does not inherently transform the valid inventory search into a pretext for investigative purposes.  *See Gallo*, 927 F.2d at 819-20 (concluding that "[t]he coincidence between

48

the DEA's suspicion that the box contained contraband and HPD's right to search the box for its independent purposes does not in this case vitiate the validity of the search").

In sum, while the Undersigned acknowledges that although there were deviations from the Sheriff's office's standard procedures – *i.e.*, allowing someone other than the Collier County Sheriff's Office deputies to remove items from the vehicle without opening closed containers – the Undersigned finds the deviations do not render the search invalid because the search was ultimately reasonable under the circumstances. *See Laing*, 708 F.2d at 1570; *see also Pinder*, 2009 WL 10670633, at *18, *report and recommendation adopted*, 2010 WL 11507903, *aff'd*, 437 F. App'x 816. Accordingly, the Undersigned finds that in light of the facts and circumstances in this case, the inventory search was not a pretext for an investigative search.

In addition to arguing that Special Agents Younce's and Morrison's involvement in the inventory search rendered the search invalid, defense counsel's questions at the hearing implied that the decision by the OIG to photograph any evidence that they found shows that their involvement was investigative in nature. (*See* Tr. at 51). Although not specifically argued or articulated by counsel, the Undersigned construes this line of questioning as an argument that the inventory search is nothing more than pretext for an investigation or that the search was not valid under the inventory search exception. (*See id.*). The Undersigned is not persuaded, however. The Northern District of Georgia rejected a similar argument in *United States v. Pinder*, No. 1:08-cr-42103-MHS-AJB, 2009 WL 10670633, at *19

(N.D. Ga. Dec. 23, 2009), *report and recommendation adopted,* No. 1:08-cr-421-03-MHS, 2010 WL 11507903 (N.D. Ga. Mar. 5, 2010), *aff'd,* 437 F. App'x 816 (11th Cir. 2011).  In *Pinder*, the Court noted that (1) it had found no authority concluding that photographing items during an inventory search demonstrates that the police had an improper motive in conducting the search and (2) photographing the contents of a vehicle is not inconsistent with the justifications for the inventory search exception.  *Id.*  Similarly, here, the Undersigned has not found, and Defendant has not cited, any case in which a court has found that photographing items during an inventory search shows that the search is a pretext for an investigative search.  Thus, the Undersigned finds that to the extent Defendant makes this argument, the argument is meritless.  *See id.*

Because the Undersigned finds that Special Agents Younce's and Morrison's participation did not render the search unreasonable, the Undersigned also finds that Defendant's argument that Special Agent Younce's decision to open the vehicle's door constituted an unreasonable search is meritless.  (*See* Tr. at 185, 187).  The Undersigned finds that because Special Agents Younce and Morrison were allowed to remove the mail, they were necessarily permitted to take reasonable steps to do so.  To the extent Defendant suggests that Special Agent Morrison exceeded the scope of his participation by entering the front driver's seat of the vehicle, (*see* Tr. at 90), the Undersigned will address the argument in the next section addressing the plain view doctrine.

### 2.     Plain View Doctrine

Because the Undersigned finds that Special Agents Morrison's and Younce's involvement in the inventory search did not render the search unreasonable, the Undersigned next considers the Government's argument that the seizures were reasonable under the plain view doctrine.  (*See* Doc. 31 at 8-9; Tr. at 167-68, 169, 171, 173-76).

Under the plain view doctrine, an officer may inspect or seize an item without a warrant where "(1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." *Brown v. United States*, 219 F. App'x 917, 919 (11th Cir. 2007) (quoting *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006), *cert. denied*, 549 U.S. 1137 (2006)); *see also Horton v. California*, 496 U.S. 128, 136-37 (1990).

The incriminating nature of an item in plain view is readily apparent when an officer has probable cause to believe that the item is contraband or evidence of a crime.  *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (stating that the plain view doctrine does not apply if officers "lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object"); *see also Payton v. New York*, 445 U.S. 573, 587 (1980) ("The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.").  The Eleventh Circuit has explained that "probable cause, in turn, 'merely requires that

the facts available to the officer would warrant a man of reasonable caution in the belief . . . that certain items may be contraband . . .; it does not demand any showing that such a belief be correct or more likely true than false.'" *United States v. Alim*, 256 F. App'x 236, 238 (11th Cir. 2007) (alterations in original) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)). In sum, "[f]or an item's incriminating character to be 'immediately apparent,' the police merely need probable cause to believe that the item is contraband." *Id.* (citing *Brown*, 460 U.S. at 730).

The Government argues that because Special Agents Morrison and Younce were lawfully permitted to enter the vehicle to retrieve the mail, the plain view doctrine governs the admissibility of (1) the Victoria's Secret credit card, (2) the rifled greeting card, and (3) the check in the amount of $2,150.00. (Doc. 31 at 8-9; Tr. at 172-74, 175-76). Defendant argues that these items are not admissible under the plain view doctrine because (1) Special Agents Morrison and Younce were not lawfully permitted in the vehicle and (2) the incriminating nature of the items was not readily apparent. (*See* Doc. 38 at 4-5; Tr. at 184-86, 187).

Because the Undersigned finds that Special Agents Younce and Morrison were lawfully permitted to retrieve the deliverable mail, the Undersigned finds that the plain view doctrine is implicated as to the items they observed in the vehicle. Accordingly, the Undersigned considers its applicability as to each piece of evidence in turn below.

As to the Victoria's Secret credit card, the Undersigned finds that the Government has not met its burden to show that the plain view doctrine applies for

at least two reasons.  First, Special Agent Morrison had no lawful right to be in the driver's front seat.  *See Brown*, 219 F. App'x at 919.  The testimony elicited at the hearing shows that the driver's seat was the only area of the car where there did not appear to be deliverable mail.  (Tr. at 66).  Additionally, Special Agent Morrison testified that the mail was visible before he leaned into the car.  (*Id.* at 102).  Thus, the Undersigned finds that Special Agent Morrison had no need to lean into the front seat to access the live mail.  (*See id.*).  Because Special Agent Morrison's involvement in the inventory search was limited to retrieving the live mail, he had no lawful right to be in any area of the vehicle where there clearly was no live mail.

Additionally, to the extent that the Victoria's Secret credit card was found in Mr. Palmer's wallet, the Undersigned finds that Special Agent Morrison had no lawful right of access to the contents of the wallet.  Although Special Agent Morrison testified that the credit card was not in the wallet, there is conflicting evidence on this issue.  Specifically, the testimony elicited at the hearing clarifies that the reports written contemporaneously with these events state that the credit card was found in the wallet.  (*See* Tr. at 93-94, 154).  In contrast, Special Agent Morrison testified that the credit card was on the seat, (*id.* at 91), and Special Agent Younce testified that it was on the dashboard, (*id.* at 153).  Special Agent Morrison was also unable to definitively testify where he saw the wallet, noting that he thought it was on the dashboard, but he doesn't recall.  (*Id.* at 91).  Furthermore, there was no definitive evidence as to how the credit card got out of the wallet, only testimony as to the agent's conjecture.  (*See id.* at 91, 94-95).  Finally, as Special Agent Younce

acknowledged, her Grand Jury testimony stated that the credit card was in the wallet. (*Id*. at 153-54). The Undersigned finds that, in light of the conflicting evidence, the Government has not met its burden to show that Special Agent Morrison had a lawful right of access to the credit card or the place where it was found. *See Brown*, 219 F. App'x at 919.

Second, even if Special Agent Morrison had a lawful right of access to the credit card, the Undersigned finds that the Government has not met its burden to show that the credit card's incriminating nature was readily apparent. *See Dickerson*, 508 U.S. at 375. Specifically, Special Agent Morrison testified that he cannot recall whether the credit card was facing up or down. (Tr. at 96-97). Importantly, the credit card holder's name – which may have caused its incriminating nature to be readily apparent – is only visible on the back of the credit card. (*Id*. at 69). Nevertheless, the Government argues that the credit card's incriminating nature was readily apparent given the nature of the store because, the explanation goes, a person who identifies as male would not typically have a Victoria's Secret credit card. (*Id*. at 170). In response, Defendant argues that "plenty of men have Victoria's Secret cards" to purchase items for their wives. (*Id*. at 184). Upon consideration of the evidence, the Undersigned finds that the Government did not meet its burden to show that the incriminating nature of the credit card was readily apparent. There is nothing inappropriate or incriminating about a person who identifies as a male possessing a Victoria's Secret credit card, regardless of the nature of the clothing store. Thus, the mere possession of the credit card does not give rise to probable

cause to believe it is evidence of a crime. *See Dickerson*, 508 U.S. at 375. In reaching this conclusion, the Undersigned notes that at the time the credit card was discovered, no other opened or rifled mail had been discovered. Accordingly, the only basis Special Agent Morrison had to believe that Mr. Palmer was engaging in criminal activity was the complaint received days earlier. (*See* Tr. at 127 (noting that the complaint was received around December 7, 2020)). As the Government admitted, the investigation was just beginning and that the agents "didn't know if there was any credence to [the complaint] or not." (*Id*. at 178). Thus, without more – including confirmation regarding whether the credit card holder's name was visible before the item was moved – the Undersigned finds that the Government has not meet its burden to show that the incriminating nature of the credit card was readily apparent. *See Dickerson*, 508 U.S. at 375. Accordingly, the Undersigned finds that the plain view doctrine does not apply to the Victoria's Secret credit card.

Next, as to the rifled greeting card, the Undersigned finds that the plain view doctrine applies. First, the Undersigned finds that Special Agent Younce had a lawful right of access to the greeting card. *See Brown*, 219 F. App'x at 919. Specifically, Special Agent Younce testified that she removed two bins from the front seat and at that point saw the opened greeting card was on the floor of the passenger front seat. (Tr. at 134-35). Her testimony is supported by the photograph entered into evidence as Exhibit 3g. (Doc. 47-12).[8] Because Special Agent Younce was

---

[8] Although Special Agent Younce testified, in response to questions by Defendant's counsel, that the picture was taken after the greeting card was removed, examined,

lawfully permitted to enter the vehicle to retrieve the live mail in the front passenger-side seat, the Undersigned finds that Special Agent Younce had a lawful right of access to the greeting card.

Additionally, the Undersigned finds the incriminating nature of the rifled greeting card was readily apparent. In reaching this conclusion, the Undersigned first notes that while Special Agent Younce admitted that she could not read the addresses, she testified that she could see that the envelope was open. (Tr. at 150). Importantly, as noted above, the pertinent question is not whether Special Agent Younce's belief that it was evidence of a crime was more likely true than false, but whether a cautious person would believe this envelope was evidence of a crime under these circumstances. *See Alim*, 256 F. App'x at 238. Given the proximity of the rifled mail to the live mail, in combination with the ongoing investigation of Mr. Palmer, the Undersigned finds that a cautious person would believe this envelope was evidence of a crime under these circumstances and the greeting card's incriminating nature was, therefore, readily apparent. *Id.*

---

and put back, Special Agent Younce specified that the greeting card was put back in the "approximate area" where it was found. (*See* Tr. at 151). The Undersigned finds Special Agent Younce's testimony that the greeting card was put back in the approximate location where it was found, (*see id.*), coupled with Special Agent Morrison's testimony that law enforcement is trained to try to photograph evidence the way it was found and in the same location it was found, (*see id.* at 85), satisfies any concern that the photograph may be unreliable. Additionally, the Undersigned highlights that the use of the photograph is merely to bolster the veracity of Special Agent Younce's testimony, given under oath and penalty of perjury.

This finding is bolstered by Special Agent Younce's testimony, which went uncontroverted at the hearing, that mail carriers are "not allowed to have open mail in their vehicle.  Especially if it's not addressed to them." (Tr. at 137).  The main proposition – *i.e.*, that a carrier cannot have open mail in his or her vehicle – is uncontroverted and persuasive.  (*Id.*).  Tellingly, the Defendant made no attempt to argue that Mr. Palmer was permitted to have open mail addressed to him or someone he knows, but rather argued that Special Agent Younce was unable to determine whether the letter was addressed to Mr. Palmer before picking it up to examine it.  (*See id.* at 185-86).  In light of all these facts and circumstances, the Undersigned finds that the incriminating nature of the rifled greeting card was readily apparent and, therefore, the greeting card is admissible under the plain view doctrine.  *See Dickerson*, 508 U.S. at 375.

As will be addressed fully below, *see* Part IV.c.3, *infra*, the Undersigned finds that the opened greeting card coupled with the December 7, 2020 complaint is sufficient to satisfy the probable cause necessary to implicate the vehicle exception. As a result, the presiding United States District Judge need not consider whether the $2,150.00 business check found in the trunk of the car is admissible under the plain view doctrine.  Nevertheless, the Undersigned will proceed to analyze the issue for the benefit of the presiding United States District Judge and the parties, in the event that the District Judge disagrees with the Undersigned's findings and recommendations below as to whether probable cause exists to justify the automobile exception absent the discovery of the $2,150.00 check.

As to the $2,150.00 business check found in the trunk of the car, the Undersigned finds that Special Agent Morrison had a lawful right of access to the check. Specifically, Special Agent Morrison testified that the check was in the trunk of the car and he only found the document after removing the live, deliverable mail in the trunk. (Tr. at 74-75). Because Special Agent Morrison was lawfully permitted to enter the vehicle to retrieve the live mail in the trunk, the Undersigned finds that Special Agent Morrison had a lawful right of access to the check in the trunk. *See Brown*, 219 F. App'x at 919.

Unlike the greeting card discussed above, however, the Undersigned finds that the incriminating nature of the check was not readily apparent. As Special Agent Morrison testified, unlike the greeting card, the check was not found with an envelope. (Tr. at 77). Additionally, Special Agent Morrison noted that only the bottom part of the check, which showed that it was in the amount of $2,150.00 and related to a Homeowner's Association, was visible. (*Id*. at 76). Additionally, the testimony is unclear whether Special Agent Morrison knew it was a check when he noticed it, referring to it as a "financial document." (*Id*. at 75). Thus, it is unclear whether Special Agent Morrison could even determine that the item was a check or something else. (*See id.*). Finally, the Undersigned notes Special Agent Morrison's testimony that the incriminating nature was evident "[u]pon reading what the check was, the date, [and] the address," none of which was visible until he removed the check. (*Id*. at 77). Ultimately, in light of the testimony elicited at the evidentiary hearing, the Undersigned finds that while it may be atypical to have a loose

"financial document" in the back of a vehicle in this context, it is not so unheard of as to give Special Agent Morrison probable cause to believe the check was evidence of a crime before picking it up to examine it further.  Thus, the Undersigned finds that the Government has not shown that the incriminating nature was readily apparent.  *See Dickerson*, 508 U.S. at 375.

In sum, the Undersigned finds that only the rifled greeting card is admissible under the plain view doctrine for the reasons set forth above.

### 3.   Automobile Exception

The Government next relies on the automobile exception to argue that the warrantless searches and seizures were reasonable.  (*See* Doc. 31 at 9-10; Tr. at 168-69).

Under the automobile exception, a warrantless search of a vehicle is permitted where "(1) there is probable cause to believe that the vehicle contains contraband or other evidence which is subject to seizure under law, and (2) exigent circumstances necessitate a search or seizure." *United States v. Alexander*, 835 F.2d 1406, 1409 (11th Cir. 1988).  The justifications for this exception are (1) to prevent vehicles from being easily moved from the jurisdiction, "thereby thwarting law enforcement efforts," and (2) that passengers in vehicles have a lesser expectation of privacy.  *Id*. (citations omitted).  Nevertheless, before a warrantless search is justified under the automobile exception, "the 'overriding standard of probable cause' must be satisfied." *Id*. (citing *California v. Carney*, 471 U.S. 386, 390 (1985); *Chambers v. Maroney*, 399 U.S. 42, 51 (1970)).

Because the second prong is easily satisfied, the Undersigned considers it first. The United States Supreme Court has held that "the ability of a vehicle to become mobile is sufficient to satisfy the exigency requirement." *U.S. v. Nixon*, 918 F.2d 895, 903 (11th Cir. 1990) (collecting cases). Since the Supreme Court's decision in *United States v. Nixon*, the Eleventh Circuit has, at times, characterized the relevant inquiry as whether the automobile is readily mobile. *See United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003) ("The first [question] is whether the automobile is readily mobile."); *see also United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007) ("The automobile exception allows the police to conduct a search of a vehicle if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search."). Here, because Mr. Palmer's vehicle had the ability to become mobile – as evinced by the use of the vehicle before the stop – the second prong is satisfied. *See id*.

Moreover, the second prong remains satisfied despite Deputy McCoy's decision to arrest Mr. Palmer and impound the vehicle. *See Michigan v. Thomas*, 458 U.S. 259, 261 (1982). In *Michigan v. Thomas*, the United States Supreme Court considered the applicability of the vehicle exception where a vehicle and its occupants are in police custody. *See id.* There, the defendant argued that the vehicle exception was inapplicable because there was no exigency given that both the vehicle and its occupants were already in police custody. *See id.* In rejecting the argument, the Supreme Court held that the justification for the warrantless search neither vanishes once the car has been immobilized nor depends on the likelihood that the

60

car will be driven away.  *Id.*  Additionally, the Supreme Court noted that even if a "demonstrable 'exigency'" was required, it would likely be satisfied because by conducting the search on the side of the road – rather than at the police station – "there was a clear possibility that the occupants of the vehicle could have had unknown confederates who would return to remove the secreted contraband."  *See id.* at 261 n.2.

Given the factual similarities between *Thomas* and the instant case, the Undersigned finds the holding in *Thomas* persuasive and the exigency prong satisfied notwithstanding the vehicle's impoundment.  *See id.* at 261; *see also United States v. Collins*, 699 F. App'x 904, 906 (11th Cir. 2017) (citing *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) for the proposition that "once officers have probable cause, the justification for a warrantless automobile search does not evaporate when the vehicle is transported to the police station to be searched.").

Having found the second prong satisfied, the Undersigned next considers the first prong—whether there is probable cause to believe the vehicle contains contraband or other evidence, which is subject to seizure under the law.  *See Alexander*, 835 F.2d at 1409.  The Eleventh Circuit has held that "[p]robable cause . . . exists when under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found' in the vehicle."  *United States v. Tamari*, 454 F.3d 1259, 1264 (11th Cir. 2006) (quoting *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002)).  Importantly, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle

and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982).

The Government argues in its opposition brief that the greeting card coupled with the complaint was sufficient to establish probable cause. (*See* Doc. 31 at 9). The Undersigned agrees. Probable cause to search a vehicle exists "'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'" *Alexander,* 835 F.2d at 1409 (quoting *United States v. Clark,* 559 F.2d 420, 424 (5th Cir. 1977)) (alteration in original). In determining whether probable cause exists, the Court "may examine the collective knowledge of the officers 'if they maintained at least a minimal level of communication during their investigation.'" *United States v. Olmedo,* 552 F.Supp.2d 1347, 1357 (S.D. Fla. 2008) (quoting *United States v. Willis,* 759 F.2d 1486, 1494 (11th Cir. 1985)).

Here, it is clear that the agents maintained more than a minimal level of communication during their investigation. For example, Special Agent Morrison testified that Special Agent Younce involved him in the investigation of Mr. Palmer following the receipt of the postal customer's complaint. (*See* Tr. at 63-64). Likewise, Special Agent Younce testified that when she discovered the greeting card, she brought Special Agent Morrison over to look at it. (*Id.* at 135). Thus, the Undersigned considers the collective knowledge of the two agents in assessing whether probable cause existed.

The collective knowledge of the law enforcement agents included both the complaint from a postal customer on Mr. Palmer's route, complaining that he or she

did not receive a signature confirmation parcel, the opened greeting card discovered next to the live mail to be delivered.  The Undersigned finds this sufficient to constitute probable cause.

To that end, the agents discovered a piece of evidence, found in the vehicle, whose incriminating nature was apparent to the officers.  Given the proximity of the opened greeting card to the live mail, the Undersigned finds that there was a "fair probability" that additional evidence of the delay, theft, or destruction of mail would be found in the vehicle.  *See Illinois v. Gates,* 462 U.S. 213, 238 (1983) (probable cause for a search exists when under the totality of the circumstances "there is a fair probability that contraband or evidence of a crime will be found in a particular place").

Likewise, the discovery of the greeting card essentially corroborated the suspicion that the agents had following the December 7, 2020 complaint— *i.e.*, that Mr. Palmer was engaging in the criminal act of delay, theft, or destruction of mail. This corroboration bolsters a finding of probable cause.  Indeed, probable cause considers the "totality of circumstances" to determine whether there is a "fair probability" that the contraband or evidence of a crime will be found in a particular place.  *See United States v. Smith*, No. 2:19-CR-122-RAH-JTA, 2020 WL 8832505, at *7 (M.D. Ala. Dec. 7, 2020), *report and recommendation adopted,* No. 2:19-CR-122-RAH, 2021 WL 719897 (M.D. Ala. Feb. 24, 2021) (citing *See Illinois v. Gates,* 462 U.S. 213, 238 (1983)).  The Eleventh Circuit has found, as occurred here, "[o]bservations and other information supplied by officers involved in a common

investigation can, taken together, create probable cause for a search." *United States v. Hyppolite*, 609 F. App'x 597, 604 (11th Cir. 2015) (citing *United States v. Goddard,* 312 F.3d 1360, 1363 (11th Cir. 2002)).

Ultimately, considering the totality of circumstances, including the proximity of the opened greeting card to the live mail, the Undersigned finds that probable cause existed to search the vehicle.  Indeed, as found above, the incriminating nature of the greeting card was readily apparent.  Thus, its discovery, coupled with the December 7, 2020 complaint, taken together create probable cause to believe that the vehicle contains contraband or other evidence which is subject to seizure under law." *See id*.

To the extent the agents themselves may not have believed they had probable cause absent the discovery of the Victoria's Secret credit card, the greeting card, and the check in the in amount of $2,150.00, (*see* Tr. 78), the Undersigned finds that this belief is not dispositive of the issue.  Indeed, subjective intentions play no role in a probable-cause Fourth Amendment analysis.  *Green v. Euler*, No. 8:08-cv-2240-T-17EAJ, 2010 WL 415309, at *8 (M.D. Fla. Jan. 29, 2010) (citing *Whren v. United States,* 517 U.S. 806 (1996)); *see also United States v. Walker*, No. 3:05-cr-108-J-32MMH, 2005 WL 5949674, at *14 (M.D. Fla. Oct. 5, 2005) (citing *United States v. Gray,* 659 F.2d 1296, 1300–01 (5th Cir. Unit B Oct.26, 1981) for the proposition that "a court is not limited to the officer's testimony regarding what information established probable cause to search or whether there was probable cause").  Rather, "[t]he inquiry focuses upon whether the facts established that the officer had

probable cause to search the vehicle." *United States v. Lanzon*, 639 F.3d 1293, 1300 (11th Cir. 2011). In other words, "the court must review the circumstances and 'determine the existence of probable cause by an objective standard.'" *Walker*, 2005 WL 5949674, at *14 (quoting *Gray*, 659 F.2d at 1300). As addressed above, the Undersigned finds that the objective standard of probable cause is met here.

Likewise, to the extent Defendant may argue that because the discovery of the opened greeting card was made after the Victoria's Secret credit card the evidence is tainted, the Undersigned is not persuaded. The discovery of the greeting card was made independently from the discovery of the Victoria's Secret credit card. That is to say, the agents in no way relied on the discovery of the Victoria's Secret credit card as a basis to search for – and ultimately discover – the greeting card. Rather, the two items were independently discovered, regardless of which was discovered first. This Court has found that when an officer has an independent source of evidence to search a vehicle, prior illegal police conduct will not render the search illegal. *See United States v. Jackson*, 548 F. Supp. 2d 1314, 1324 (M.D. Fla. 2008). Here, because the discovery of the Victoria's Secret credit card in no way influenced the discovery of the opened greeting card, the Undersigned finds that the greeting card may independently give rise to probable cause and need not be suppressed. *See United States v. Harris*, 175 F.3d 1017 (4th Cir. 1999) (upholding the denial of motion to suppress drugs located in car after an illegal seizure and holding that the "canine sniff provided the requisite probable cause to obtain the search warrant and was an independent source from the illegal seizure of the vehicle").

Because both prongs of the automobile exception are satisfied, the agents were entitled to "search [] every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). This includes closed containers, including the center console, so long as an officer has probable cause to believe that the container holds evidence of the crime. *See California v. Acevedo*, 500 U.S. 565, 579 (1991); *see also United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005).

Here, the remaining evidence was located in an open compartment of the vehicle's trunk and the closed center console. (*See* Tr. at 75, 141, 155, 158-59). Given that the agents had probable cause to search for evidence of stolen or delayed mail, the Undersigned finds that the searches of the trunk and the center console did not exceed the scope of the automobile exception. Rather, given the presence of live mail in the trunk, and the proximity of the loose check to that mail, (*see id.* at 74-75), the Undersigned finds that probable cause existed to search the trunk. Likewise, given the nature and size of the potential evidence – *i.e.*, opened or rifled letters – the Undersigned finds that probable cause also existed to search the center console, where opened or delayed mail could have been hidden.

In sum, the Undersigned finds that the checks in the amount of $2,150.00 and $5,893.88 are admissible under the automobile exception.

### 4.   Inevitable Discovery Doctrine

In the alternative, the Government argues that all of the seized items would be admissible under the inevitable discovery doctrine because Deputy McCoy would

have searched the locations where the items were found during an inventory search

and that he would have turned the items over to the OIG.  (*See* Doc. 31 at 10-12; Tr.

at 171-72, 175-76, 190-94).

　　Under the doctrine of inevitable discovery, despite an illegal search, "if the

prosecution can establish by a preponderance of the evidence that the information

would have ultimately been recovered by lawful means, the evidence will be

admissible." *United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (citing *Nix

v. Williams*, 467 U.S. 431, 434 (1984)); *see also United States v. Watkins*, No. 18-14336,

2021 WL 3700295, at *5 (11th Cir. Aug. 20, 2021) (concluding that the

preponderance of evidence standard – rather than the reasonable probability standard

– applies to the inevitable discovery doctrine and overruling any decision holding to

the contrary).  The preponderance standard of proof requires the proponent provide

evidence that "is more convincing than the evidence offered in opposition to it."

*Watkins*, 2021 WL 3700295, at *5 (quoting *Metro. Stevedore Co. v. Rambo*, 521 U.S.

121, 137 n.9 (1997)).  In other words, the evidence must "persuade[] the trier of fact

that a proposition 'is more likely true than not true.'"  *Id.* (quoting *United States v.

Deleveaux*, 205 F.3d 1292, 1296 n.3 (11th Cir. 2000)).

　　For the doctrine to apply, the prosecution must also show that "the lawful

means which made discovery inevitable were being *actively pursued* prior to the

occurrence of the illegal conduct."  *Virden*, 488 F.3d at 1322. (quotation marks and

citation omitted) (emphasis in original).  However, "'[a]ctive pursuit' does not

require that police have already planned the particular search that would obtain the

evidence.  The government must instead establish that the police would have discovered the evidence 'by virtue of ordinary investigations of evidence or leads already in their possession.'"  *United States v. Senese*, 798 F. App'x 499, 501 (11th Cir.), *cert. denied,* 141 S. Ct. 306 (2020) (quoting *United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015)).

The Undersigned finds that the Government has met its burden to show that the two checks and the greeting card would have inevitably been discovered during the inventory search.  Specifically, the testimony elicited at the hearing made clear that Deputy McCoy was actively planning to complete an inventory search when the OIG agents became involved, and that Deputy McCoy ultimately completed his inventory search.  (Tr. at 20, 23, 33).  Additionally, Deputy McCoy specifically testified that he would – and in fact did – inventory items found in the front passenger seat, the trunk, and center console.  (*Id.* at 27-28, 33).  Deputy McCoy also testified that had he come across open mail during the inventory search, he would have turned it over to postal employees.  (*Id.* at 29).  This evidence was uncontroverted by Defendant.  Thus, the Undersigned finds that the Government has shown by a preponderance of evidence that these items would have been found. *See Virden*, 488 F.3d at 1322.

As to the Victoria's Secret credit card, however, the Undersigned finds that the Government has not met its burden.  While counsel for the Government argued that Deputy McCoy would have inventoried the contents of the wallet, (Tr. at 170), the Government elicited no testimony that Deputy McCoy would have reviewed and

inventoried every individual item in the wallet as part of his inventory search. Having said that, the Undersigned acknowledges that given the purpose of the relevant inventory search – *i.e.*, the protection of the police against claims or disputes over lost or stolen property – it may be logical to believe that Deputy McCoy would have identified and inventoried the contents.  Nevertheless, even if that were true, the Government elicited no testimony that Deputy McCoy would have reviewed each item to such an extent that he would have realized the incriminating nature of the credit card.  Thus, while Deputy McCoy testified that had he found a credit card in the name of another, he would have turned it over to the appropriate authorities, (*id.* at 59), he proffered no testimony to satisfy the Undersigned that Deputy McCoy would have inevitably discovered the cardholder's name.  For the reasons fully above, *see* Part IV.c.2, *supra*, the Undersigned finds that there is nothing incriminating about the possession of the card – even one with the activation sticker still attached.  Additionally, to the extent the Government may argue that the Victoria's Secret credit card was no longer in the wallet, the Undersigned again finds for the reasons addressed above that the Government has not met its burden to resolve the facts surrounding the original location of the credit card.  Thus, without more, the Undersigned finds that the Government has not met its burden to show by a preponderance of evidence that the Victoria's Secret credit card would have inevitably been found.  *See Virden*, 488 F.3d at 1322.

As a final matter, to the extent Defendant attempts to argue that the inevitable discovery doctrine cannot apply because the OIG agents' involvement rendered the

inventory search invalid, (Tr. at 182-83; Doc. 38 at 6), the Undersigned finds the argument meritless.  First, as addressed fully above, the Undersigned finds that the OIG agents' limited involvement in the search did not render the search invalid.  *See* Part IV.c.1, *supra*.  Second, even if the OIG agents' involvement would have rendered the inventory search invalid, Defendant cites no legal authority supporting his position that the inevitable discovery doctrine does not apply when an inventory search is found to be invalid.  (*See* Tr. at 182-83; *see also* Doc. 38 at 6); *but see United States v. Horn*, 970 F.2d 728, 732 (10th Cir. 1992) (noting that even if the search did not fall within the bounds of the inventory search exception, "had the search been conducted in the manner defendant suggests is proper, it was inevitable that the weapons would have been discovered and that defendant would have been charged with their possession").

Additionally, considering the purpose of the exclusionary rule and the justification for the inevitable discovery doctrine, the Undersigned finds that suppressing the greeting card and the two checks would not be appropriate. Specifically, while a Fourth Amendment violation may trigger the exclusionary rule, which requires suppression of illegally obtained evidence, the rule is one of "last resort."  *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).  Thus, the exclusionary rule applies only if the "deterrence benefits outweigh [the] substantial social costs" of suppressing evidence.  *Id.* (quotation omitted).  To that end, the deterrence benefits cannot be merely incremental, marginal, or simply possible; they must be substantial and must actually outweigh the costs. *Herring v. United States*, 555 U.S. 135, 141,

70

147-48 (2009). The Supreme Court has recognized the inevitable discovery doctrine as one of the exceptions in which the deterrence benefits are not outweighed by the social costs. *Strieff*, 136 S. Ct. at 2061. Rather, the Supreme Court has explained that the inevitable discovery doctrine is akin to the harmless error rule. *Nix v. Williams*, 467 U.S. 431, 443 n.4 (1984).

Here, the social costs are not outweighed by the incremental deterrence benefit gained by excluding the evidence. *See Strieff*, 136 S. Ct. at 2061. Specifically, because the agents' involvement was limited to only retrieving mail – rather than actively searching the car – the Undersigned finds that their involvement, if error at all, was no more than a harmless error. Additionally, as discussed fully above, because the testimony shows that the greeting card and the two checks would have inevitably been discovered regardless of the agents' involvement, the Undersigned finds the social costs are not outweighed by the deterrence benefits in this case. *See Strieff*, 136 S. Ct. at 2061.

In sum, the Undersigned finds that the motion to suppress should be granted in part and denied in part. Specifically, the Undersigned finds that the Victoria's Secret credit card and the Cheesecake Factory gift card should be suppressed. As to the Cheesecake Factory gift card, because the Government made no attempt to show that an exception applies – stating instead that it had no intent on relying on the gift card – the gift card is due to be suppressed. (*See* Tr. at 36, 162). As to the Victoria's Secret credit card, the Government has failed to meet its burden to show that the credit card is admissible under any exception or doctrine. Accordingly, the credit

71

card is due to be suppressed.  As to the remaining evidence, the Undersigned finds the items admissible for the reasons explained above.

**CONCLUSION**

Based upon the foregoing, the Undersigned **RESPECTFULLY RECOMMENDS** that:

1.    Defendant's Motion for Pre-Trial Suppression Hearing and Memorandum of Law in Support Thereof (Doc. 26) be **GRANTED in part and DENIED in part** as set forth below.

    a.   The motion be granted to the extent it seeks an Order suppressing the Victoria's Secret credit card and the Cheesecake Factory gift card.

    b.   The motion be denied to the extent it seeks any greater or different relief, including the suppression of the check for $5,893.88 made out to ENO Plastic USA in Fairfield, CA from Abec Filtration; the check for $2,150.00 made out to Window Genie of Naples from Anchor Associates Inc.; and the Christmas Card addressed to 3250 Quilcene Lane, Naples, Florida.

**RESPECTFULLY RECOMMENDED** in Chambers in Ft. Myers, Florida on November 23, 2021.

_____
Mac R. McCoy
United States Magistrate Judge

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Copies furnished to:

Counsel of Record
Unrepresented Parties